UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KUTEST KIDS EARLY INTERVENTION, <br><br> Plaintiff, <br><br> v. <br><br> OHIO SECURITY INSURANCE COMPANY, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Case No. 20-cv-11169-DJC <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                                                  **September 20, 2021**

**I.   Introduction**

Plaintiff Kutest Kids Early Intervention ("Kutest Kids") has filed this lawsuit against Ohio Security Insurance Company ("Ohio Security"), requesting a declaratory judgement that its alleged losses from the COVID-19 pandemic are covered under a property insurance policy from Ohio Security (Count I) and alleging breach of contract for same (Count II). D. 14. Ohio Security has moved for judgment on the pleadings. D. 24. For the reasons stated below, the Court ALLOWS the motion.

**II.  Standard of Review**

Rule 12(c) allows a party to move for judgment on the pleadings at any time "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). A motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) is "ordinarily accorded much the same treatment" as a Rule 12(b)(6) motion. Aponte-Torres v. Univ. of P.R., 445 F.3d 50, 54 (1st Cir.

1

2006). To survive a motion for judgment on the pleadings, therefore, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Because a motion for judgment on the pleadings "calls for an assessment of the merits of the case at an embryonic stage," the Court "view[s] the facts contained in the pleadings in the light most favorable to the nonmovant and draw[s] all reasonable inferences therefrom" in their favor. Pérez-Acevedo v. Rivero-Cubano, 520 F.3d 26, 29 (1st Cir. 2008) (citation omitted).

On a Rule 12(c) motion, unlike a Rule 12(b) motion, the Court considers the pleadings as a whole, including the answer. See Aponte-Torres, 445 F.3d at 54-55. Those assertions in the answer that have not been denied and do not conflict with the assertions in the complaint are taken as true. See Santiago v. Bloise, 741 F. Supp. 2d 357, 360 (D. Mass. 2010). In addition, "[t]he court may supplement the facts contained in the pleadings by considering documents fairly incorporated therein and facts susceptible to judicial notice." R.G. Fin. Corp. v. Vergara-Nuñez, 446 F.3d 178, 182 (1st Cir. 2006).

**III.     Factual Background**

Unless otherwise indicated, the following summary is based on the facts as alleged in the amended complaint and the exhibits referenced therein, D. 14.

    **A.     Kutest Kids**

Kutest Kids provides treatment and services—such as physical, speech and occupational therapy, and specialized instruction—to children with developmental disabilities and their families at its Philadelphia location ("Building") and in these families' homes throughout Philadelphia. D. 14 ¶¶ 7, 39–41. The Building includes a therapy center for children and an indoor playground. Id. ¶ 42.

**B.     Insurance Policy**

*1.     Coverage*

Kutest Kids purchased an insurance policy ("Policy") from Ohio Security on October 24, 2019, which included Business Income and Extra Expense loss coverage and coverage for closure by Order of Civil Authority. Id. ¶¶ 13–14. The Business Income loss provision states, in relevant part, that Ohio Security "will pay for the actual loss of Business Income . . . due to the necessary suspension of your 'operations' during the 'period of restoration.'" D. 14-1 at 40. The suspension of operations "must be caused by direct physical loss of or damage to property at the described premises," and "[t]he loss or damage must be caused by or result from a Covered Cause of Loss." Id.  The Extra Expense provision requires Ohio Security to "pay necessary Extra Expense[s] [incurred] during the 'period of restoration' that [Kutest Kids] would not have incurred if there had been no direct physical loss or damage to property at the described premises." Id. at 42. Similarly, the "loss or damage must be caused by or result from a Covered Cause of Loss. Id. Ohio Security must also pay "for the actual loss of Business Income . . . and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises" when a "Covered Cause of Loss causes damage to property other than property at the described premises" and when the following conditions both apply:

> (1) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and

> (2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

Id. at 43.

    2. *Virus Exclusion*

The Policy contains a coverage exclusion for loss caused by a virus ("Virus Exclusion"). D. 14 ¶ 60. The exclusion states that Ohio Security "will not pay for loss or damage caused directly or indirectly by . . . [a]ny virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease." D. 14-1 at 53, 55. The Virus Exclusion applies "regardless of any other cause or event that contributes concurrently or in any sequence to the loss [and] whether or not the loss event results in widespread damage or affects a substantial area." Id. at 53. The Virus Exclusion was first added to property insurance policies around 2006 when two industry trade groups, the Insurance Services Office ("ISO") and American Association of Insurance Services ("AAIS"), filed the exclusions with various state regulators, including in Pennsylvania. D. 14 ¶¶ 64–65.

  C. **COVID-19 Pandemic**

In early 2020, COVID-19, a highly contagious airborne virus, was declared a pandemic by the World Health Organization. Id. ¶¶ 28–29. The Commonwealth of Pennsylvania and City of Philadelphia issued a variety of COVID-related orders beginning in March 2020 (collectively, the "Orders"). On March 6, 2020, Pennsylvania Governor Tom Wolf ("Wolf") issued a Proclamation of Disaster Emergency. Id. ¶ 30. On March 16, 2020, Wolf called for all non-essential businesses to close, and the City of Philadelphia ordered closure of same on that day. Id. ¶¶ 31–32. On March 19, 2020, Wolf ordered all physical locations of non-life sustaining businesses to close. Id. ¶ 33. On March 23, 2020, Wolf issued a Stay-at-Home order, which included residents of Philadelphia, and extended that order for the entire state on April 1, 2020. Id. ¶ 34–35. Wolf announced a plan to reopen counties within Pennsylvania on May 22, 2020, and on July 15, 2020, mandated that businesses conduct operations remotely unless it was not possible. Id. ¶¶ 36–37.

Kutest Kids closed its Building on March 16, 2020, until the week of August 17, 2020 ("Closure"), during which time Kutest Kids continued services virtually for families that chose to receive such services. Id. ¶ 44–45. Kutest Kids made certain alterations to the Building, including rearranging furniture, installing plexiglass or other makeshift barriers, and affixing physical signs and markers around the Building. Id. ¶ 46. On May 20, 2020, Kutest Kids submitted a notice of loss to Ohio Security claiming a business income loss, which Ohio Security denied on May 22, 2020. Id. ¶¶ 58–59.

## IV.     Procedural History

Kutest Kids instituted this action on June 19, 2020, D.1, and amended its complaint on September 2, 2020, D. 14. Ohio Security has now moved for judgment on the pleadings as to both claims. D. 24. The parties rested on their papers and the Court took the matter under advisement. D. 36.

## V.     Discussion

Under Pennsylvania law,[1] interpreting an insurance policy, like all contracts, is a question of law. Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co., 589 Pa. 317, 331 (2006). When a contract is clear and unambiguous, its meaning "is to be discovered only from the express language of the agreement." Steuart v. McChesney, 498 Pa. 45, 49 (1982). "A contract provision is not ambiguous simply because the parties do not agree on the construction of the provision." Brian Handel D.M.D., P.C. v. Allstate Ins. Co., 499 F. Supp. 3d 95, 99 (E.D. Pa. 2020). In an insurance coverage dispute, the insured bears the initial burden to show that the claim falls within the coverage provided by the policy. McEwing v. Lititz Mut. Ins. Co., 77 A.3d 639,

---

[1] The parties agree that Pennsylvania law applies. D. 31 at 15 n.5.

646 (Pa. Super. Ct. 2013). The burden then shifts to the insurer to show that a policy exclusion provides a basis for denial of coverage. Id.

### A. Declaratory Judgment (Count I)

#### 1. Coverage

##### a) Business Income and Extra Expenses

The parties dispute whether Kutest Kids' claim falls within the terms of coverage for loss of Business Income and Extra Expenses because coverage under both provisions is triggered when the loss is "caused by direct physical loss of or damage to property at the described premises." D. 14-1 at 40, 42; see D. 25 at 25; D. 31 at 16–25.

Kutest Kids first contends that its alleged losses fall within the Policy's coverage because the COVID-19 causes property damage and its uncontrolled spread means that the virus could be present at the Building. D. 31 at 18–19. Kutest Kids relies primarily upon Friends of Danny DeVito v. Wolf, 227 A.3d 872, 887 (Pa. 2020), cert. denied, 141 S. Ct. 239 (2020), asserting that the Pennsylvania Supreme Court "made a binding and precedential legal determination that COVID-19 causes substantial damage to property," and that the court found COVID-19 to be "ubiquitous [such that it is] reasonable to conclude that it was present at and/or contaminated Plaintiff's premises." D. 31 at 18–19. Kutest Kids' interpretation misreads the holding of DeVito and its import to this case. There, the Pennsylvania Court construed the governor's statutory authority to issue an emergency order and close non-essential businesses. In reading "the provisions of the Emergency Code [that] apply to 'disasters[,]'" the Pennsylvania Court was required to interpret the statutory meaning of "natural disaster," and in so doing held that COVID-19 fit into the broad category of "natural disasters" provided by the statute. DeVito, 227 A.3d at 888–89. The Pennsylvania Supreme Court's "discussion of a statute triggering executive authority

6

for various natural disasters has no bearing on how [courts] are to construe the plain language of an insurance contract." See TAQ Willow Grove, LLC v. Twin City Fire Ins., 513 F. Supp. 3d 536, 544–45 (E.D. Pa. 2021).  Moreover, the court held that COVID-19 was a natural disaster under the statute because natural disasters "all involve 'substantial damage to property, hardship, suffering or possible loss of life," and the "COVID-19 pandemic is unquestionably a catastrophe that 'results in . . . hardship, suffering or possible loss of life.'" DeVito, 227 A.3d at 888–89 (ellipsis in original).  Thus, COVID-19 fit within the definition of a natural disaster because it caused "hardship, suffering or possible loss of life," not because it caused "substantial damage to property." Id.  Moreover, it had "nothing to do with property insurance" and, therefore, its ruling "has no bearing on how [this Court is] to construct the plain language of an insurance contract." TAQ Willow Grove, LLC, 513 F. Supp. 3d at 544–45.

Kutest Kids next asserts that the Policy's usage of "physical loss of or damage" in the "disjunctive necessarily means that either a 'loss' or 'damage' is required," pointing the Court to dictionary definitions of these terms for their ordinary meaning.  D. 31 at 20–21.  Kutest Kids argues that its loss is "physical loss" because the Building is unusable or uninhabitable, and accordingly they do not need to show damage because they have shown "physical loss." Id.

Kutest Kids' argument about the meaning of "physical loss" is unpersuasive.  First, "physical" modifies the term loss, and "[p]hysical means '[o]f, relating to, or involving material things; pertaining to real, tangible objects.'" Frank Van's Auto Tag, LLC v. Selective Ins. Co. of the Se., No. 20-cv-2740, 2021 WL 289547, at *5 (E.D. Pa. Jan. 28, 2021) (quoting "physical" in Black's Law Dictionary (11th ed. 2019)).  Second, "physical loss" has been "widely held" in the insurance context "to exclude alleged losses that are intangible or incorporeal." Id. (quoting 10A Couch on Ins. § 148:46 (3d ed. 2020) (explaining meaning of "physical loss" to "preclude any

claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property"). Third, for an insured "to assert an economic loss resulting from their inability to operate their premises as intended within the coverage of the Policy's 'physical loss' provision, the loss and the bar to operation from which it results must bear a causal relationship to some physical condition of or on the premises." 4431, Inc. v. Cincinnati Ins. Companies, 504 F. Supp. 3d 368, 385 & n.16 (E.D. Pa. 2020) (citing Motorists Mut. Ins. Co. v. Hardinger, 131 F. App'x 823, 826 (3d Cir. 2005) (concluding that in cases where source of alleged loss is "unnoticeable to the naked eye," like asbestos, physical loss means actual presence of the source of contamination that causes the structure to be made unusable or uninhabitable)); Hums. & Res., LLC v. Firstline Nat'l Ins. Co., 512 F. Supp. 3d 588, 600 (E.D. Pa. 2021) (concluding same).[2]

Here, Kutest Kids does not allege that COVID-19 was ever present or detected in the Building, that the existence of COVID-19 affected the physical condition of the Building, or that the Building was unusable because the virus was present there. See D. 14. To the contrary, Kutest Kids alleges that it closed the Building because of the Orders and the "ongoing pandemic," and that Philadelphia had a "high risk of community transmission," with over 33,000 cases as of September 2020. Id. ¶¶ 38, 43. Thus, Kutest Kids' "alleged losses bear no causal connection to

---

[2] Numerous courts have similarly read identical policy language (i.e., rejecting Kutest Kids' proposed interpretation of "physical loss"). See Boscov's Dep't Store, Inc. v. Am. Guarantee & Liab. Ins. Co., No. 5:20-CV-03672-JMG, 2021 WL 2681591, at *5 n.3 (E.D. Pa. June 30, 2021) (citing cases). Kutest Kids attempts to distinguish these decisions by asserting that they do not address DeVito. D. 31 at 24. First, several of these decisions do address that case. See TAQ Willow Grove, LLC, 513 F. Supp. 3d at 544–45; Ultimate Hearing Sols. II, LLC v. Twin City Fire Ins. Co., 513 F. Supp. 3d 549, 559 (E.D. Pa. 2021). Second, for the reasons stated above, DeVito does not support Kutest Kids' claim.

the physical condition of its properties," which is "fatal to its claim" for coverage under the Policy. See Boscov's Dep't Store, Inc., 2021 WL 2681591, at *7.

            b)        Civil Authority Orders

Kutest Kids argues that it is covered for losses under the Civil Authority provision because "[a]ccess to [the Building] was prohibited under the government orders and the orders were in response [to] dangerous conditions (i.e., COVID-19 contamination and the continued imminent threat of contamination)." D. 31 at 30. For coverage under the Policy, Kutest Kids must, among other things, show "damage to property other than [the Building]," and that "[a]ccess to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage," preventing Kutest Kids from using the Building. D. 14-1 at 43. Kutest Kids has not alleged any facts as to either requirement. Aside from facts about the overall prevalence of COVID-19 cases in Philadelphia, see D. 14 ¶ 38, Kutest Kids alleges no facts as to other properties near it or any damage to them. See D. 14. Nor does Kutest Kids allege that the Orders prevented access to the Building because of said damage, but rather just that Kutest Kids closed its Building as a result of the Orders and the ongoing pandemic. See D. 14 ¶ 43. Moreover, the Orders do not themselves prohibit access, but merely suspend certain in-person operations. See, e.g., D. 27-4; D. 31 at 31 (asserting that inability to conduct in-person operations from Building triggers coverage under Civil Authority Provision).

Accordingly, Kutest Kids has not met its burden to show that its alleged losses are covered under the Policy.

        2.        *Virus Exclusion*

Even if Kutest Kids had shown its alleged losses to be covered under the Policy, the Virus Exclusion precludes coverage. The Virus Exclusion applies to "any virus . . . that induces or is

capable of inducing physical distress, illness or disease." D. 14-1 at 53, 55.  The Virus Exclusion applies "regardless of any other cause or event that contributes concurrently or in any sequence to the loss [and] whether or not the loss event results in widespread damage or affects a substantial area."  Id. at 53. Under the unambiguous language of the Virus Exclusion, the Policy does not cover losses directly or indirectly caused by COVID-19, a virus that can lead to illness, disease and death.  See D. 14 ¶¶ 28, 38; see also Lansdale 329 Prop, LLC v. Hartford Underwriters Ins. Co., No. 20-cv-2034, 2021 WL 1667424, at *10 (E.D. Pa. Apr. 28, 2021) (collecting cases concluding that Virus Exclusion unambiguously bars coverage for losses caused by COVID-19).  To the extent Kutest Kids argues that the Orders were a wholly separate cause of the alleged losses, the Virus Exclusion similarly applies as the Orders were imposed in response to COVID-19 and the Virus Exclusion applies to indirect losses.  See D. 14-1 at 53, 55; D. 14 ¶¶ 31, 37 (describing Orders as response to COVID-19).

Kutest Kids offers two arguments for why the Virus Exclusion does not apply, neither of which is persuasive.  First, Kutest Kids invokes the doctrine of regulatory estoppel and contends that insurance industry groups made "fraudulent statements . . . to secure approval of the virus exclusion" in property insurance policies. D. 31 at 32.  Regulatory estoppel "prohibits parties from switching legal positions to suit their own ends."  Sunbeam Corp. v. Liberty Mut. Ins. Co., 566 Pa. 494, 500 (2001).  Thus, if an insurer (or representative industry group) represents to a regulatory agency that policy language will not result in decreased coverage, the insurer cannot then assert the opposite position in court.  Id.  "To establish regulatory estoppel under Pennsylvania law, the party seeking to invoke it must establish that the opposing party made a statement to a regulatory agency and later adopted a position contrary to the one presented to the regulatory agency."  Hums. & Res., LLC, 512 F. Supp. 3d at 602 (internal quotation marks and citation omitted).

Here, the ISO and AAIS statements filed with state insurance regulators in 2006 make clear that property insurance policies have not been and were not intended to be a source of recovery for damage from disease-causing agents such as a virus. The AAIS statement to which Kutest Kids cites explains that "[t]his endorsement clarifies that loss, cost, or expense caused by, resulting from, or relating to any virus . . . is excluded."[3] The ISO Circular similarly states: "[T]he specter of pandemic or hitherto unorthodox transmission of infectious material raises the concern that insurers employing [property] policies may face claims in which there are efforts to expand coverage and to create sources of recovery for such losses, contrary to policy intent. In light of these concerns, we are presenting an exclusion relating to contamination by disease-causing viruses or bacteria or other disease-causing microorganisms."[4] Ohio Security "takes the same position here as the ISO and AAIS did by arguing that the virus exclusion eliminates coverage for any damage or loss," therefore "regulatory estoppel does not apply to this action." See Brian Handel D.M.D., P.C, 499 F. Supp. 3d at 101 (considering identical virus exclusion language); see also Hussey Copper, Ltd. v. Arrowood Indem. Co., 391 F. App'x 207, 211 (3d Cir. 2010) (rejecting regulatory estoppel argument when "the statements, when read in context, show that the ISO consistently represented to regulators that the [] exclusion would apply").

---

[3] The Court considers the 2006 statements of both agencies as they were fairly incorporated into the pleadings. The AAIS statement is quoted in relevant part at: Richard P. Lewis et al., *Here We Go Again: Virus Exclusion for COVID-19 and Insurers*, NU Property Casualty 360 (Apr. 7, 2020, 12:00 AM), https://www.propertycasualty360.com/2020/04/07/here-we-go-again-virus-exclusion-for-covid-19-and-insurers/ (last visited Sept. 17, 2021).

[4] Larry Podoshen, *New Endorsements Filed to Address Exclusions of Loss Due to Virus or Bacteria*, ISO Circular, 2 (July 6, 2006), https://www.propertyinsurancecoveragelaw.com/files/2020/03/ISO-Circular-LI-CF-2006-175-Virus.pdf (last visited Sept. 17, 2021).

Second, Kutest Kids asserts the Virus Exclusion should not apply because the origins of COVID are "unknown" and the Virus Exclusion's language requires a virus to be naturally occurring. D. 31 at 33–34.[5] The plain language of the Virus Exclusion, however, refers to "any virus" that induces or is capable of inducing "physical distress, illness or disease," D. 14-1 at 53, 55, and, even as alleged by Kutest Kids, COVID-19 is "a highly contagious airborne virus" that has resulted in thousands of deaths and has caused its alleged losses, see D. 14 ¶¶ 28, 38, 50.

Accordingly, the Virus Exclusion applies.

### 3.  Reasonable Expectations

Kutest Kids asserts that its reasonable expectations of what the Policy would cover (i.e., for losses caused by COVID-19 and the Orders), should supersede the express language of the Policy and the Virus Exclusion. See D. 31 at 36.

Even if the terms of an insurance policy are clear and unambiguous, the insured's reasonable expectations may prevail over such terms in specific instances, but none of those is present here. See Bensalem Twp. v. Int'l Surplus Lines Ins. Co., 38 F.3d 1303, 1309 (3d Cir. 1994) (citing Pennsylvania cases); Tonkovic v. State Farm Mut. Auto. Ins. Co., 513 Pa. 445, 454 (Pa. 1987). The reasonable expectations doctrine applies "where the insurer or its agent creates in the insured a reasonable expectation of coverage . . . [but the insurer] make[s] unilateral changes to an insurance policy" after the policy is purchased, which the insured does not understand. UPMC Health Sys. v. Metro. Life Ins. Co., 391 F.3d 497, 503 (3d Cir. 2004). The doctrine also applies "when a claimant alleges that the insurer engaged in deceptive practices toward the insured,

---

[5] Kutest Kids did not allege any facts regarding COVID-19's supposed other origins and seeks leave to amend. D. 31 at 34. In light of the Court's ruling regarding the Virus Exclusion, amendment in this regard would be futile and the request is denied. See Hatch v. Dep't for Children, Youth & Their Families, 274 F.3d 12, 19 (1st Cir. 2001).

either to misrepresent the terms of the policy or to issue a policy different than the one requested by the insured and promised by the insurer." West v. Lincoln Ben. Life Co., 509 F.3d 160, 169 (3d Cir. 2007) (citing Pennsylvania cases and concluding that "[i]n the absence of an affirmative misrepresentation by the insurer or its agent about the contents of the policy, the plain and unambiguous terms of a policy demonstrate the parties' intent and they control the rights and obligations of the insurer and the insured"). Here, Kutest Kids purchased the sole Policy at issue in October 2019. D. 14 ¶ 13. Kutest Kids does not allege unilateral change to the Policy or deceptive practices on the part of Ohio Security. See D. 14. For all of these reasons, the Court rejects Kutest Kids' reasonable expectations argument.

### B. Breach of Contract (Count II)

For the reasons set forth above, Kutest Kids cannot plead a breach of contract claim, where its allegations in the amended complaint do not state a breach of the Policy. See Wilson v. Hartford Cas. Co., 492 F. Supp. 3d 417, 429 (E.D. Pa. 2020) (dismissing breach of contract claim "since an unambiguous virus exclusion in the Contract applies and none of the specified causes of loss" were available to plaintiff).

## VI. Conclusion

For the foregoing reasons, the Court ALLOWS Ohio Security's motion for judgment on the pleadings. D. 24.

**So Ordered.**

/s/ Denise J. Casper  
United States District Judge